UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

RONALD RAE McPHEE,

    Plaintiff,

vs.

SERGEANT D. BARLOW,

    Defendants.

Case No. 3:21-cv-858-MCR-HTC

**PLAINTIFF'S RESPONSE TO DEFENDANT WILLIAMS
MOTION FOR SUMMARY JUDGMENT (ECF 101)**

Plaintiff Ronald Rae McPhee responds to Defendant Marie Williams Motion for Summary Judgment (ECF 101) and would show as follows:

Defendant Williams seeks summary judgment on the following premises:

a. That the injury was a "benign lipoma" and was not objectively serious;

b. That Nurse Williams was not deliberately indifferent to the risk of harm.

**STATEMENT OF DISPUTED AND ADDITIONAL FACTS**

1. Plaintiff disputes that his injury was not objectively serious. It was not simply a painful disfigurement of his right forearm, but a constellation of injuries caused by twisting his arms and fingers beyond their flex points and twisting the handcuff on his right wrist abrading skin. Defendants Barlow and Urbaniak[1] had twisted Plaintiff's shackled arms up "as far as they could go," escorting him in that fashion. (ECF 05 at ¶¶ 7-9). Subsequently Barlow twisted

---

[1] Initially Plaintiff referred to Urbaniak as John Doe 1. He has subsequently been identified through discovery as Officer Kerry Urbaniak.

1

his right hand, using the metal handcuff as leverage. Urbaniak yanked Plaintiff's right arm using the metal handcuff, "tearing skin from around Plaintiff wrist." (Id. at ¶¶ 26, 28). Barlow "repeatedly slammed the slot flap door up against Plaintiff's right arm." (Id. at ¶ 32). Barlow and Urbaniak only stopped after noting the severity of damage to Plaintiff's arm. (Id. at ¶¶ 34-35).

2. After Barlow and Urbaniak's use of force at Santa Rosa C.I., around 9:08 to 9:15 a.m. on December 22, 2017, a Lieutenant came to Plaintiff's cell with an officer operating a hand-held camera. About a minute later, the hand-held camera focused on Plaintiff's cell-front and two minutes later, Nurse Williams arrived. Plaintiff was calm and not disruptive (Id. at ¶¶ 38-42). Thus, Williams was able to see the multiple injuries shortly after they had occurred.

3. Plaintiff showed Defendant Williams his injuries on hand-held video. He recalls pleading, "Ma'am could you have me pulled from my holding cell for medical treatment because I am in serious pain right now and it feel like something in my arm could have been torn apparent or broken." (Id. at ¶ 45).

4. The hand-held video recording shows Nurse Williams looking obliquely down through the narrow cell-door window at where Plaintiff's arms and hands would be. She does not have Plaintiff taken out of the cell and does not examine the wrists through the handcuff slot. Nurse Williams spends approximately 70 seconds at cell front and then leaves. (ECF 101 Exh. B).

5. The prison ER record filled out by Nurse Williams indicates that the Post-Use-of-Force exam took place at about 9:10 a.m. The form records the vital signs

taken at the sick call earlier that morning – not after the use of force (since it would have been necessary to take Plaintiff out of his cell to take Plaintiff's vitals after the use of force. No physician was notified. Nurse Williams claims to have provided Plaintiff Ibuprofen but clearly does not happen on video. Williams says his response to treatment was "good." (ECF 101-1 at 6).

6. Plaintiff disputes that he threatened a nurse at sick call or used the words "kill" or "fuckin bitch." Rather, he recalls his statement, after the nurse had declined to address his back injury as, "Okay, we done." Immediately after these words, Defendant Barlow aggressively cut him off by stating "don't have time for this shit." (ECF 30-1 at 2). There is absolutely no notation in the medical records of any threats or disorderly behavior. (ECF 101-1 at 4-5). Interestingly, Capt. William Turner who does the lead-in for the post use of force hand-held video gives still another version of why force was used. He says Plaintiff "refused to exit the medical room. Sgt. Barlow gave verbal orders. He refused. Sgt. Barlow attempted to escort Inmate McPhee. He pulled away back into the medical room at which time Sgt. Barlow used reactionary force." (ECF 101, Exhibit C at 9:02 on the video time stamp).

7. The trouble with Defendant Barlow started because of any threats but rather because Barlow's handling of Plaintiff was unduly rough and Plaintiff reminded him that there was a camera outside the foyer that could see what he was doing, at which point Barlow temporarily desisted. (ECF 05 at ¶¶ 2-3).

8. Plaintiff disputes that he was noncompliant or disruptive or that he constituted

3

a security threat and that he protested, "I am not resisting nor am I being disruptive so there's no need to escort me like this my shoulders are hurting." To this, Defendant Urbaniak ordered Plaintiff to shut up. (Id. at ¶¶ 11-12). Apparently, no video of the escort was preserved. Thus, Plaintiff disputes that he was not examined outside his cell because he was a "security risk." During the video, he appears standing quietly at the window. There is no banging or shouting or any demonstration of anger. (ECF 101, Exhibit B).

9. Defendant Williams appears at 9:05 a.m. on the video counter. (Id.). Plaintiff submits that he asked Ms. Williams, "Ma'am could you have me pulled from my holding cell for medical treatment because I am in serious pain right now and it feel like something in my arm could have been torn apparent (sic) or broken." (ECF 05 at ¶ 45). Plaintiff submits that Nurse Williams response was, "[N]o just keep your arm like the way you have it upward and the swelling will go down. (Id. at ¶ 46). The hand-held video shows Nurse Williams holding her right arm up, just before she turns to leave. (ECF 101, Exh. B). Plaintiff recalls his response, then, was "[M]a'am no something are really wrong with my arm my hand and forearm are swollen but it's a knot or lump the size of a golf ball right here that's sticking out above the swelling that's not normal and it hurts." (ECF 05 at ¶ 47).

10. Defendant Williams claims that FDC required a "calming down" period and that this was the reason for not pulling him out of his cell to be examined. Plaintiff disputes that he was not calm. (ECF 05 at ¶ 42). Even Nurse

Williams concedes that he was "responsive to questions." (ECF 101-3 at ¶ 11).

11. Plaintiff disputes that there was any conversation about a "calming down" period. In the medical record, Williams notes his "response to treatment" was "good" and does not state he was disorderly. (ECF 101-1 at 6-7). Plaintiff drew Williams' attention to the golf ball-sized lump. Nurse Williams did not acknowledge the knot or Plaintiff's skin lacerations in her report. (Id.)

12. Williams declined to examine Plaintiff's injuries while they were fresh – even failing to examine his wrist through the handcuff slot. (ECF 101, Exhibit B). Williams claims she gave Plaintiff Ibuprofen but is not seen handing him anything. (Id.). Williams spent a total of 70 seconds cell-front. (Id.).

13. After Williams left, Plaintiff had to wait nine hours until the next shift change at 6:00 p.m. to report his injuries to the security officers on that shift who summoned Nurse Bray. By this time, Plaintiff's right hand had turned dark and Emergency Medical Services (EMS) was called. (Id. at ¶¶ 50-56).

14. Nurse Bray's report indicated complaints of "cold, numbness to fingers, large bump to arm," due to "use of force today." She noted a right forearm "deformity," "poor cap refill, nailbeds to (right) fingers pale bluish; fingers cold to touch." Her report indicated Dr. Fillingane was contacted and Plaintiff was transported to the Baptist Hospital Emergency Room. (ECF 101-1 at 9).

15. Doctors at Baptist Hospital found no fracture, but they did find finger and wrist sprains and a hematoma. (ECF 101-1 at 13-17). Follow-up was set with Dr. Leslie Remski, Orthopedic Trauma, Baptist Medical Group. (Id. at 18).

Pain medications were prescribed. (Id. at 19). Plaintiff had his recreation privileges suspended for seven days to facilitate recovery. (Id. at 22).

16. The series of events that led to Plaintiff's injuries occurred on December 22, 2017, at D Dorm, Santa Rosa C.I. at approximately 8:50 a.m. (Id. at ¶ 1). The delay in treatment caused him to spend most of the night at the Baptist Hospital Emergency room, leaving just before midnight. (ECF 101-1 at 12).

17. As of January 10, 2018, Plaintiff still complained of soreness in the area of the injuries and had finger and wrist soreness. He was prescribed naproxen and hand exercises. (ECF 05 at 23). As of March 15, 2018, Plaintiff still had swelling and deformity in the right wrist area. (Id. at 25). Dr. Fillingane made a request for radiology of the injury site. (Id. at 28). No fracture was found but there was a soft tissue mass noted near the radius. (Id. at 32).

18. Nearly a year later, on September 17, 2018, the tissue mass at the trauma site still remained. Plaintiff was referred to the Reception and Medical Center (RMC) for surgery. (Id. at 34). On February 21, 2019, Dr. Ajmal Baig, MD., performed surgery to remove the mass at the right forearm trauma site. "Yellow soft tissue measuring 5.0x4.5x1.0 cm" was removed. (Id. at 41-42).

19. As noted above, Plaintiff disputes that he was medically examined in any meaningful way by Nurse Williams on the morning of December 22, 2017. He disputes that he was disorderly or that he represented a security risk or that there was any reason why he could not be medically examined on that date. Plaintiff disputes that FDC rules prevented him from being examined by

Nurse Williams. He disputes that his injury was not objectively serious or that Nurse Williams was not aware of the objectively serious injury as the large deformity to his forearm was clear and obvious when she saw him and he specifically pointed it out to her. The visible symptoms of the injuries lingered for well over a year and ultimately required surgery.

## MEMORANDUM OF LAW

Summary judgment is appropriate when pleadings and evidence demonstrate "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A party seeking summary judgment has the initial burden to show the absence of a genuine dispute of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The court must view the evidence in the light most favorable to the nonmoving party, drawing all reasonable inferences for the nonmoving party. *Matsushita Elec. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Kingsland v. City of Miami*, 832 F.3d 1220, 1226 (11th Cir. 2004).

### A. Plaintiff's Version of Events

Plaintiff depends on his verified Amended Complaint of July 15, 2021, to set out the facts in his case. A *pro se* plaintiff's complaint, however, if verified under 28 U.S.C. § 1746, is equivalent to an affidavit, and thus may be viewed as evidence. *See Murrell v. Bennett*, 615 F.2d 306, 310 n.5 (5th Cir. 1980). Although it is no longer the operative complaint in this case, "a verified complaint is not just a pleading; it is also

7

the equivalent of an affidavit for purposes of summary judgment," because it "contains factual allegations that if included in an affidavit or deposition would be considered evidence, and not merely assertion." *Ford v. Wilson,* 90 F.3d 245, 246 (7th Cir. 1996). The verified complaint does not lose its character as the equivalent of an affidavit just because a later, amended complaint, is filed. *Beal v. Beller*, 847 F.3d 897, 901 (7th Cir. 2017). *See Jacoby v. Mack*, Civil Action No. 13-0070-KD-B at *7, n.3 (S.D. Ala. Apr. 3, 2019) ("The Eleventh Circuit found that Plaintiff's initial complaint, although superseded by an amended complaint, was verified and "may be treated as an affidavit on summary judgment[]").

     As noted above, Plaintiff claims his comment prior to the use of force was, "Okay we done" and that he warned the Defendant Barlow that he was on video. Plaintiff stated that his hands were then "twisted" up and the cuffs were yanked, abrading the skin. (ECF 05 at ¶¶ 7-9, 26, 28). He told officers, "I am not resisting nor am I being disruptive so there's no need to escort me like this my shoulders are hurting." Plaintiff was told to shut up. (Id. at ¶¶ 11-12). Barlow "repeatedly slammed the slot flap door up against Plaintiff's right arm." (Id. at ¶ 32). Barlow and Urbaniak only stopped after noting the severity of damage to Plaintiff's arm. (Id. at ¶¶ 34-35). When Williams arrives at cell front, Plaintiff pleads with her: "Ma'am could you have me pulled from my holding cell for medical treatment because I am in serious pain right now and it feel like something in my arm could have been torn apparent (sic) or broken." (ECF 05 at ¶ 45).

8

B.  **The Video Version of Events**

As the video shows, Williams was at the cell front for just 70 seconds total. (ECF 101, Exhibit B) The entirety of Williams' examination was captured on a five-minute video. (Id). Williams claims she was not permitted by officers to take Plaintiff out of the cell. (ECF 101, Exhibit C at ¶ 7). Williams never opens the handcuff slot or actually physically examines Plaintiff's injuries. (ECF 101, Exhibit B). There is no notation in the medical records of any threats or disorderly behavior either before or after the use of force. (ECF 101-1 at 4-5, 6-7). Williams contends that this was her "last encounter with Mr. McPhee with respect to his injuries from the use-of-force incident. (ECF 101 at 7; Exhibit C at ¶ 18). Thus, the video shows the complete examination. Williams neither examines the hand through the slot nor does she provide Plaintiff with pain medication through the slot. (Id., Exhibit B).

Where video is provided, a court must "view[] the facts in the light depicted by the videotape." *Shaw v. City of Selma*, 884 F.3d 1093, 1098 (11th Cir. 2018). Williams claims that she was prevented from giving Plaintiff any direct, hands-on care by the officers present owing to their security concerns. However Plaintiff states repeatedly that he was not disruptive or non-compliant; Williams said that he was responsive to questions and his response to treatment was "good." There is no indication in any of the medical records, beginning with the sick call visit, that indicates that Plaintiff was uncooperative or threatening. A jury could infer that Plaintiff was being cooperative and clearly articulated his medical concerns and that Williams would have seen the large knot on his forearm and the abrasions on his wrists and chose not to treat them

9

– even to the extent of examining the injuries through the handcuff slot. Although, as an LPN, Nurse Williams was not qualified to diagnose the disfigurement on the arm, she would have been able to palpate the knot and report it and to provide something for the pain which she clearly does not do on the cell-front video.[2]

Defendant Williams refers to the lipoma as "non-serious" (ECF 101 at 25) but does not explain why it had to be surgically removed. There is no reference to any medical evidence; it is merely her *ipse dixit*. A delay in medical treatment for serious or painful injuries may amount to deliberate indifference. *Harris v. Coweta County*, 21 F.3d 388, 393 (11th Cir. 1994). Whether a delay constitutes deliberate indifference depends on the reason for the delay, the length of the delay, and the nature of the medical need. *Id*. at 393-94. The Eleventh Circuit has concluded that "an unexplained delay of hours in treating a serious injury states a prima facie case of deliberate indifference." *Brown v. Hughes*, 894 F.2d 1533, 1538 (11th Cir. 1990), *cert. denied*, 496 U.S. 928, 110 S.Ct. 2624, 110 L.Ed.2d 645 (1990) ("When prison guards ignore without explanation a prisoner's serious medical condition that is known or obvious to them, the trier of fact may infer deliberate indifference."). *See also Estelle v. Gamble*, 429 U.S. at 104, n. 11 (*citing Hughes v. Noble*, 295 F.2d 495, 495 (5th Cir.

---

[2] Williams claims to have "given" Plaintiff 200 mg of Ibuprofen (ECF 101 at 6-7; Exhibit A at 6) but she certainly doesn't do so on the hand-held video since she would have had to pass it through the slot and clearly does not do so. (ECF 101, Exhibit B). She contends that "[t]his was Nurse Williams last encounter with Mr. McPhee with respect to his injuries from the use-of-force incident. (ECF 101 at 7; Exhibit C at ¶ 18). Elsewhere she says she "instructed" McPhee to take 200 mg of Ibuprofen from the dorm box, although she doesn't say how he was supposed to get it. (ECF 101 at 4). That is different from "giving" it to him.

1961) (13 hours delay); and *Fitzke v. Shappell*, 468 F.2d 1072 (6th Cir. 1972) (12 hours delay). *Murey v. City of Chickasaw*, Civil Action 1:18-00275-KD-N, at *21-22 (S.D. Ala. Nov. 21, 2019)

In cases alleging a delay in treatment, even when treatment is ultimately provided, deliberate indifference may be "inferred from an unexplained delay in treating a known or obvious serious medical condition." *Harris v. Coweta Cnty., Ga.*, 21 F.3d 388, 394 (11th Cir. 1994). A plaintiff must demonstrate that defendants' response to a serious medical need "was poor enough to constitute an unnecessary and wanton infliction of pain, and not merely accidental inadequacy, negligence in diagnosis or treatment, or even medical malpractice actionable under state law." *Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000) (quotations omitted). A prison official may violate the Eighth Amendment where pain treatment "was so cursory as to amount to no care at all." *McElligott v. Foley*, 182 F.3d 1248, 1257 (11th Cir. 1999). Here, Williams did not bother to even examine Plaintiff's wrist and forearm through the handcuff slot and although she states she gave him pain medication, the video clearly shows beyond controversy that she did not.

A jury could reasonably conclude from these facts that the injuries were serious, that the additional ten hours without treatment or medication resulted in pain which Plaintiff contends was severe and that Plaintiff was at Baptist Hospital several hours after that. Moreover, the delay resulted in additional harm since any response had to be handled at night after the day shift had gone home. Dr. Fillingane had to be contacted at 8:30 p.m. (ECF 101-1 at 9) and the transfer to the Baptist

Hospital Emergency Room had to take place at night. Plaintiff's discharge was ten minutes before midnight. (Id. at 12).

        Respectfully Submitted, <u>s/ James V. Cook</u>
                     JAMES V. COOK, ESQ.
                     Florida Bar Number 0966843
                     Law Office of James Cook
                     314 West Jefferson Street
                     Tallahassee, FL 32301
                     (850) 222-8080; 561-0836 fax
                     cookjv@gmail.com

                     <u>Attorney for Plaintiff</u>

I CERTIFY the foregoing was filed electronically on 2/9/2023, serving counsel of record registered to be notified by the CM/ECF electronic filing system.

                             <u>/s/James V. Cook</u>